Filed 2/27/14  P. v. Mulvany CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063443 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE318616) |
| DANA MICHAEL MULVANY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Allan J. Preckel, Judge.  Affirmed with directions.

Michael S. Pedretti for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Laura A. Glennon, Deputy Attorneys General, for Plaintiff and Respondent.

Dana Mulvany appeals from a judgment convicting him of two counts of grand theft and other offenses arising from his participation in the theft of a vehicle from a car dealership and subsequent sale of the car to a third-party purchaser.  He argues there is

insufficient evidence to support the jury's finding that he was one of the participants in the thefts. He also argues the trial court improperly imposed an upper-term sentence. We reject these contentions.

The Attorney General correctly notes that the abstract of judgment should be corrected because it omits one of the counts and incorrectly describes the sentencing disposition. Accordingly, we affirm the judgment and remand with directions to correct the abstract of judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In November 2011, the El Cajon Mitsubishi car dealership hired a company to provide temporary salespersons to assist with an expected influx of customers during a two-week promotional sales event. The company sent defendant, Lance Stalf, and two other individuals to work at the dealership. The dealership's manager (Christopher Pozek) testified that when defendant and Stalf arrived at the dealership to work, they did not have the required Department of Motor Vehicles (DMV) sales license. They were told to obtain the license and they could then return to the dealership to work. Defendant and Stalf returned to the lot the next day, but they still did not have a license. They were again told to obtain it before they could work. Defendant returned to the dealership on the third day with a temporary sales permit dated November 15, 2011, and he was allowed to work. Stalf never brought a sales permit to the dealership, and Pozek did not see Stalf again.

Pozek testified that defendant and Stalf were always together when they were at the dealership, and it was apparent from their conversations they knew each other and

2

socialized together.  In contrast, the other two temporary salespersons had the required sales license when they first arrived for work, and they did not appear to know defendant and Stalf before their arrival at the dealership.

Although Stalf was not authorized to be working at the dealership because he had no license, he apparently did interact with the customers.[1]  On two occasions Stalf assisted Asmahan Rasheed in her search for a car to buy at the dealership.  Rasheed told Stalf she wanted a Mazda and could spend only $10,000.  After she could not find a car that she liked in her price range, Stalf told her that he would call her if he found a suitable car, and they exchanged phone numbers.

On the morning of November 15, Stalf called Rasheed and said he had found a Mazda for $10,000.  She asked if she could come to the dealership to see the car during her lunch break, but Stalf told her that he would drive the car to her work.  About one-half hour later, Stalf arrived at Rasheed's work with a second man.  The two men showed Rasheed a Mazda vehicle they claimed belonged to the second man and was being sold through the dealership.  The men told her the car had low mileage and was worth more than $10,000, but the second man wanted to sell it at a cheaper price for a quick sale because he was going through a divorce.  Rasheed told the men she would bring the money (in cash) when she was finished with work.  Stalf stated she did not have to bother walking to the dealership and they would bring the car to her home.  Rasheed gave them

---

[1]     Pozek testified there were a lot of people on the dealership's lot during the promotional sales event, and it was not possible to monitor them all.

her home address and the two men left, with the second man driving the Mazda and Stalf driving another car.

At about 6:00 p.m. that evening, Stalf and the second man arrived outside Rasheed's home, with the second man again driving the Mazda and Stalf driving another car. The men told Rasheed they were in a hurry because they had to return to work, and the transaction was conducted in about five minutes. The second man gave Rasheed the DMV documents, and told her that he did not want to fill them out because of his poor handwriting and he would tell her what to write. After Rasheed filled out the paperwork based on the second man's instructions, the second man signed the documents as the seller, using the name Jack Dempsey. Rasheed gave the second man the cash for the car, and the second man gave her the car keys and a phone number in case she had any questions.

About one-half hour later, Rasheed noticed the car's license plates had the dealership name, but no numbers, on them. When she called the phone number provided by the second man, the number was out of service. When she called Stalf, no one answered. When she called the dealership and told them about her purchase of the Mazda, manager Pozek checked and discovered that no Mazda had been sold and a Mazda was missing from the lot. Pozek told Rasheed that the car was stolen and she had been "ripped off." A few minutes after she spoke to the dealership personnel, Stalf called Rasheed and told her not to worry; he would "bring . . . the paper over the next day"; and she did not have to talk to the dealership. Stalf did not contact her again; the dealership took the car back; and the police were summoned. Police investigation revealed that the

4

address that Rasheed had been instructed to write on the DMV paperwork was a nonexistent address.

Pozek testified that the day defendant came to the dealership with his temporary sales permit was the only day defendant worked at the dealership, and on that day he had access to vehicle keys. Also, the stolen Mazda had been in the "[r]econditioning" area of the lot and its keys had not yet been entered into the dealership's "key track" system which would have limited who could gain access to the keys. Defendant never returned to the dealership after the incident with Rasheed even though the sales event for which he was hired was continuing for another week.

In January 2012 (about two months after the offense), Rasheed was shown a photo lineup containing defendant's photo and the photos of six other similar appearing men. Examining the pictures in chronological order, she first stopped at photo number 3 (not defendant), and said " 'This guy looks very much like the guy, but I am just not sure.' " After she examined photo number 4 (defendant) and compared it with photo number 3, she said, " 'Now, that I see this photograph, I believe this is the guy.' " When the officer conducting the lineup asked if she was sure, she answered, " 'I am sure.' " About two weeks later during another six-person photo lineup, Rasheed immediately identified Stalf as the man who showed her the cars at the dealership.

At the preliminary hearing in August 2012 (about nine months after the offense), Rasheed variously answered that defendant was not the second man; she was not sure;

and he looked like him " 'a little' " but she did not think it was him.[2] Similarly, at trial in January 2013 (about 13 months after the offense), Rasheed variously testified that she did not know if defendant was the second man; defendant looked a "little" like him; defendant did not look like him; and she was "not sure."[3] When asked at trial to explain the differences between defendant and the second man, Rasheed testified: "[The second man's] hair was a little bit lighter, he was lighter, and his face was bigger."

Investigating officer Stacy Orchulli testified that the photo of defendant in the lineup about two months after the offense was from the DMV picture taken for his November 15, 2011 temporary sales permit. Officer Orchulli noticed that when defendant appeared at the preliminary hearing in August 2012, there were changes in his physical appearance, including his hair color had changed and he had a goatee. Also, at trial, his hair color was darker and he no longer had the goatee. Officer Orchulli testified that his hair appeared brown in the DMV photo; at trial it appeared "dark brown, maybe black"; and it appeared lighter at the preliminary hearing. Officer Orchulli acknowledged

---

[2] The testimony regarding her preliminary hearing identification was as follows: "[Defense counsel: When asked at the preliminary hearing if defendant was the second perpetrator] [w]hat was your answer? [Rasheed:] It was not. [¶] . . . [¶] . . . I said 'No.' I wasn't sure. [¶] . . . [¶] . . . '[H]e looks like him a little, but I don't think it is him.' "

[3] The testimony was as follows: "[Prosecutor:] Now, that second person with Lance who showed up at your work that day, do you see that person anywhere in the courtroom today? [¶] . . . [¶] [Rasheed:] I don't know. [¶] [Prosecutor:] Was there anyone in the courtroom who looks similar to that person? [¶] [Rasheed:] A little, a little, but I can't. [¶] . . . [¶] . . . I can't—It doesn't look like him. . . . [¶] . . . [¶] [Prosecutor:] So you are not sure if there is anyone in the courtroom today? [¶] [Rasheed:] I am not sure."

6

that his face looked the same in the DMV picture, at the preliminary hearing, and at trial. She is trained in making observations, and she never had any difficulty observing that the person in court was the person depicted in the DMV photo.

In his defense, defendant presented the testimony of forensic document examiner David Oleksow, who obtained samples of defendant's handwriting (signing the name Jack Dempsey) and compared them with the Jack Dempsey signature on the DMV documents. Oleksow testified he was unable to "identify or eliminate" defendant as the person who signed the DMV documents.

*Jury's Verdict and Sentence*

Defendant was charged and convicted in four counts: (1) conspiracy to commit grand theft from a person, grand theft of an automobile, and embezzlement by an employee; (2) grand theft from a person; (3) grand theft of an automobile; and (4) embezzlement by an employee. He was sentenced to an upper term of three years on count 2 (grand theft from a person), and the sentences on the remaining counts were imposed concurrently (count 3, grand theft of an automobile) and stayed (count 1 conspiracy, and count 4 embezzlement).

DISCUSSION

I. *Sufficiency of Evidence that Defendant Was Perpetrator*

Defendant argues the record does not support the jury's finding that he was the second man involved in the thefts.

In reviewing a challenge to the sufficiency of the evidence, we examine the entire record in the light most favorable to the judgment to determine whether there is

7

substantial evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Nelson* (2011) 51 Cal.4th 198, 210.) We presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*Ibid*.)

The evidence showed that defendant and Stalf arrived at the dealership to work as temporary employees; they knew each other and socialized together; and they were observed to be regularly together at the dealership. On November 15, 2011, defendant acquired his temporary sales permit, worked at the dealership that day, and thereafter never returned even though his temporary employment position was ongoing. That same date the perpetrators sold the car to Rasheed. In the six-person photo lineups conducted a couple of months after the offense, Rasheed immediately identified Stalf as the perpetrator who showed her the cars, and she provided a firm identification of defendant as the second man who helped Stalf carry out the fraudulent transaction.

Drawing all reasonable inferences in favor of the judgment, there is sufficient evidence for the jury to find beyond a reasonable doubt that defendant was the second man. First, Rasheed's identification of defendant at the photo lineup constituted direct evidence that he was the perpetrator. Second, there was significant circumstantial evidence supporting the validity of her identification. The jury could consider that the offense was related to the dealership, and out of the six men in each of the photo lineups Rasheed selected men who had been hired to work at that dealership. Further, the two men arrived at the same time to work at the dealership as temporary employees, and they were known to associate closely with each other at the dealership and on their free time.

8

Also, on November 15 (the date the car was sold to Rasheed) defendant went to the DMV to acquire his temporary sales permit which gave him an opportunity to secure the needed DMV-transfer documents, and on that same date he worked at the dealership and had access to the car keys needed to take the vehicle and transport it to Rasheed to accomplish the sale. Furthermore, defendant never returned to the dealership after the theft was completed.

Although circumstances such as companionship with another perpetrator, opportunity to commit the offense, and flight after the offense cannot individually establish guilt, they are relevant factors to consider when evaluating all the evidence. (See *People v. Elliott* (2012) 53 Cal.4th 535, 584; *People v. Prevost* (1998) 60 Cal.App.4th 1382, 1400; *People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *In re Lynette G.* (1976) 54 Cal.App.3d 1087, 1095; *People v. Williams* (1946) 73 Cal.App.2d 154, 157-158.) The record supports the jury's verdict based on the victim's photo lineup identification of defendant, as well as the evidence showing that defendant was in close companionship with the other perpetrator identified by the victim; on the date of the offense defendant had the opportunity to obtain the needed DMV documents and he had access to the dealership's vehicles; and he evinced a consciousness of guilt by effectively fleeing from the dealership after completion of the fraudulent transaction.

To support his challenge to the jury's verdict, defendant argues that Rasheed's responses during the photo lineup, the preliminary hearing, and at trial, show she was either not sure he was the second perpetrator, or she thought he was not that person. Although Rasheed was considering two photos at the photo lineup as possibly depicting

9

the second perpetrator, she ultimately firmly selected defendant, telling the officer that she was sure the second photo was the man. Further, the fact that Rasheed was unable to identify defendant at the preliminary hearing and at trial did not compel the jury to reject her earlier photo lineup identification of him. The jury could reasonably conclude the photo lineup identification was reliable because the DMV photo depicted defendant's appearance on the date of offense, and the lineup identification was made closer in time to the offense than the in-court identifications. Also, the investigating officer's testimony indicated that there were changes in defendant's appearance, including to his hair color and facial hair. The jury could reasonably assess that Rasheed's inability to identify defendant at the preliminary hearing and at trial was influenced by changes in his appearance.

The record supports the jury's finding that defendant was the person who committed the offenses.

## II. *Selection of Upper Term*

Defendant argues the trial court improperly selected an upper term sentence.

When deciding whether to impose an upper, middle or lower term, the trial court is required to set forth its reasons for imposing the term it selects. (Pen. Code, § 1170, subd. (b); Cal. Rules of Court, rule 4.420(e)[4]; *People v. Sandoval* (2007) 41 Cal.4th 825, 846-847.) The trial court has broad discretion to select the term, and on appeal we review its decision for abuse of discretion. (*Sandoval, supra*, at p. 847.) The trial court's

---

[4] Subsequent rule references are to the California Rules of Court.

discretion must be exercised in a manner that is not arbitrary and capricious, and its decision must be based on individualized, relevant, and proper considerations. (*Ibid*.) The court may properly consider "circumstances in aggravation or mitigation, and any other factor reasonably related to the sentencing decision." (Rule 4.420(b).) Aggravating circumstances include a particularly vulnerable victim, the court's selection of concurrent rather than consecutive sentences for other counts; the crime involved planning or sophistication; the defendant took advantage of a position of trust or confidence; and the defendant has numerous prior convictions. (Rule 4.421(a)(3), (7), (8), (11), (b)(2).)

Defendant presented numerous letters of support from persons attesting to his good character, which were noted by the court at the sentencing hearing. However, citing defendant's "lengthy and serious" criminal history, the circumstances of the current offense, and the need to send a message of deterrence, the court concluded defendant was not a suitable candidate for probation or a "split sentence" (i.e., community supervision). When selecting the upper term for count two (grand theft from a person), the court set forth the following reasons: it could have imposed a consecutive (rather than a concurrent) term for count 3 (grand theft of an automobile); defendant had an extensive criminal history; the offenses showed planning and sophistication; Rasheed was more vulnerable than the average individual; and defendant took advantage of a position of trust and confidence.

Defendant asserts the court's reasons for the upper term were irrelevant or unsupported by the record. To the contrary, the court's reasons reflect a rational sentencing decision based on relevant considerations supported by the record. The

11

probation report shows that starting in 1989 defendant sustained numerous criminal convictions (including false impersonation, forgery, burglary, drug possession, driving under the influence, theft, and assault and battery), and he served time in prison. Although many of his offenses were resolved as misdemeanor convictions, the trial court could reasonably determine that his repeated convictions show he has not yet learned how to refrain from violating the law. Additionally, defendant's current offense reflects a significant level of planning and thought; i.e., defendant and his accomplice had to take the vehicle from the lot without detection by dealership personnel, and had to make the transaction appear legitimate to Rasheed, including securing DMV paperwork. The record also supports that Rasheed was vulnerable in that she was a relatively young adult of 28 years of age; she was an Iraqi immigrant who had arrived from Kuwait only four years earlier; and she was conducting the transaction on her own. Further, defendant, who had been hired to work at the dealership on a temporary basis, violated the trust placed in him when he was given access to the dealership cars. Finally, the court had the option of selecting consecutive sentences for counts 2 and 3 based on a factual determination that the two thefts (first from the dealership, then from Rasheed) involved distinct victims and acts separated by time and location, which reflected multiple intents notwithstanding a common overall objective. (See *People v. Andra* (2007) 156 Cal.App.4th 638, 640-642; *People v. Felix* (2001) 92 Cal.App.4th 905, 915-916; *People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253-1257; *People v. Williams* (1992) 9 Cal.App.4th 1465, 1472-1474.)

To support his challenge to the upper term, defendant contends the court made irrelevant and inappropriate statements when it described him as "glib" and then made a "joke" about not believing defendant's statement the sun was shining until obtaining confirmation by looking out the window.[5] When interviewed by the probation officer, defendant said he was "dumbfounded" the jury convicted him; provided various explanations for his presence at the dealership, association with Stalf, and departure from the dealership after the offense; and denied that he was a participant in the theft scheme. At sentencing, the court noted the probation report reflected that defendant wanted the court to believe he had "nothing to do" with the thefts. The court rejected this suggestion, stating the jurors had "no trouble" convicting defendant and it found their verdicts were correct and well-supported. In this context, the court made the comments about defendant being glib and the court not believing defendant's statement about the sun without confirmation.

The court's statements reflect its determination that defendant's denial of guilt and explanations to the probation officer were not credible. The trial court was entitled to

---

[5]    In this regard, the court stated: "[Defendant] presents himself as a very intelligent and verbal, and I would have to say somewhat glib[,] individual. But in all candor and forthrightness, knowing what I know about [defendant], if he were to tell me that the sun is shining outside, I would first go to the window to confirm that for myself before giving him any credence."

make this credibility assessment, and its statements in this regard do not show an abuse of discretion.[6]

### III. *Correction of Abstract of Judgment*

As pointed out by the Attorney General, the abstract of judgment must be corrected because it omits count 3 and incorrectly delineates the sentencing disposition. The superior court is directed to issue a new abstract of judgment accurately reflecting the sentence: (1) count 1, conspiracy: stayed three-year upper term; (2) count 2, grand theft from a person: three-year upper term; (3) count 3, grand theft of a vehicle: concurrent three-year upper term; and (4) count 4, embezzlement by an employee: stayed three-year upper term. Also, the abstract of judgment incorrectly states that defendant is sentenced to prison due to a strike prior conviction, whereas no strike prior was alleged and the court committed him to "local imprisonment" in the custody of the county sheriff. The abstract should be corrected to reflect this disposition.

---

[6] Given our holding that the court did not err in imposing the upper term, we need not address the issues of forfeiture and ineffective assistance of counsel raised by the parties.

DISPOSITION

The judgment is affirmed.  The superior court is directed to prepare an amended abstract of judgment accurately reflecting the sentencing disposition as stated in Part III above and to forward a copy to the proper authorities.

_____

HALLER, J.

WE CONCUR:


_____

HUFFMAN, Acting P. J.


_____

McINTYRE, J.